FILED

UNITED STATES DISTRICT COURT

4:59 pm, 8/16/23

**Margaret Botkins
Clerk of Court**

1  S. Gregory Thomas, WY Bar No. 5-2653
   Thomas & Thomas LLC
2  316 S. Gillette Ave., Suite 200
   Gillette, WY 82716
3  (307) 257-5298
4  greg@tntlaw.org

5

6  Douglas Park *
   CA Bar No. 233398
7  Reza Dibadj *
   CA Bar No. 240829
8  Park & Dibadj, LLP
9  655 Oak Grove Ave., Unit 329
   Menlo Park, CA 94026
10 (650) 814-3933
   doug@parkdibadj.com
11 reza@parkdibadj.com

12 * Pending Admission *Pro Hac Vice*

13
   *Attorneys for Plaintiffs*
14

15            **IN THE UNITED STATES DISTRICT COURT**

16
              **FOR THE DISTRICT OF WYOMING**
17

18 WYOMING TRUST COMPANY, NANCY          Case No.:  23-CV-148-KHR
   BUTCHER, AND KURT HALL, TRUSTEES
19 OF THE DEAN W. HALL MINERAL TRUST
   DATED SEPTEMBER 25, 1981; WYOMING     **COMPLAINT**
20 TRUST COMPANY, NANCY BUTCHER, AND
   KURT HALL TRUSTEES OF THE DEAN W.
21 HALL IRREVOCABLE TRUST DATED JULY
   1, 1982; WYOMING TRUST COMPANY,
22 TRUSTEE OF THE JOY LUCILLE HALL
   AND DEAN W. HALL TRUST DATED JULY
23 10, 1973; AND HALL ATLAS, LLC,
24
               Petitioners/Plaintiffs,
25

26 vs.

27

28
                        COMPLAINT
                                                                        1

UNITED STATES DEPARTMENT OF THE INTERIOR; DEB HAALAND, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE INTERIOR; BUREAU OF LAND MANAGEMENT; TRACY STONE MANNING, IN HER OFFICIAL CAPACITY AS DIRECTOR, BUREAU OF LAND MANAGEMENT; APPRAISAL AND VALUATION SERVICES OFFICE; TIM HANSEN, IN HIS OFFICIAL CAPACITY AS DIRECTOR, APPRAISAL AND VALUATION SERVICES OFFICE; DIVISION OF MINERALS EVALUATION; KATHY KILGORE, IN HER OFFICIAL CAPACITY AS DIRECTOR, DIVISION OF MINERALS EVALUATION; ANDREW ARCHULETA, IN HIS OFFICIAL CAPACITY AS WYOMING STATE DIRECTOR, BUREAU OF LAND MANAGEMENT

Respondents/Defendants

1. This suit, brought under 30 U.S.C. § 1270, "Citizens Suit," seeks to compel an exchange of coal tracts pursuant to the statutory conditions set forth in 30 U.S.C. § 1260(b)(5) of the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"). When Congress passed SMCRA, it specifically provided that "[i]t is the policy of Congress that the Secretary *shall* develop and carry out a coal exchange program to acquire private fee coal precluded from being mined by the restrictions of this paragraph (5) in exchange for Federal coal which is not so precluded." (emphasis added)

2. In accordance with the notice requirement of 30 U.S.C. § 1270(a), Plaintiffs provided 60 days' notice to the Department of the Interior prior to the commencement of this action.

**JURISDICTION AND VENUE**

3. This court has jurisdiction pursuant to 28 U.S.C. § 1331 which grants the federal district courts "original jurisdiction of all civil actions arising under the

COMPLAINT

Constitution, laws, or treaties of the United States."  This action arises under the laws of the United States, including S.M.C.R.A, the Administrative Procedures Act ("A.P.A") 5 U.S.C. §§ 701-706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2201.

4.      Pursuant to 30 U.S.C. § 1270(a), "[t]he district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties."

5.      Venue is appropriate in the District of Wyoming in accord with 30 U.S.C. § 1270(c)(1), because the Plaintiffs' coal tract is located in Campbell County, Wyoming.

6.      Plaintiffs have filed a parallel action in the United States District Court for the District of Columbia because that court has exclusive jurisdiction over action "by the Secretary promulgating national rules or regulations."  30 U.S.C. § 1276(a)(1).  Plaintiffs intend to consolidate these actions if further information supports a characterization of the Department of Interior's *de facto* rulemaking as either national or limited to Wyoming. Sadly, the federal courts have had to deal with problems almost identical to this case across decades and federal jurisdictions.  *See, e.g.,* Whitney Benefits v. U.S., 926 F.2d 1169, 1171 (Fed. Cir. 1991) ("the government proffers a plethora of attorney arguments and assertions, none of which finds adequate support in the evidence, all of which are treated and rejected in what follows"); Nance v. Sec'y of the Interior, D. Mont., Case No. CV-06-125-BLG-RFC (D. Mont., Feb. 26, 2013) ("Plaintiffs then began the long and ultimately fruitless process of negotiating with the Department of the Interior for the coal exchange they had been promised. . . . [T]the history of this case tells us they [Plaintiffs] would still have nothing if they had not filed the suit."); Texaco Inc. v. Andrus, Nos. 79-2448; -2458, D.D.C., August 15, 1980 (unpublished opinion) ("Since the fee exchange program is mandatory, the Secretary cannot engage in this type of speculation.").  The

COMPLAINT

3

problem may indeed be national in scope and not limited to the Department of the

Interior's activities in Wyoming.  Rather than develop a program to encourage AVF coal

exchanges as mandated by Congress, the Department of the Interior has allowed its

Bureau of Land Management ("BLM") and Appraisal and Valuation Services Office

("AVSO") to apply inconsistently and incorrectly a mish-mash of rules, regulations,

guidelines, and manuals–including federal coal leasing rules, surface land exchange

manuals, and various appraisal guidelines to process applications.

## PARTIES

7.    Defendant United States Department of the Interior is a federal executive

department responsible, *inter alia*, for oversight of the Bureau of Land Management

("BLM") and the Appraisal and Valuation Services Office ("AVSO").  The Department's

Headquarters are in Washington, D.C.

8.    Defendant Deb Haaland is the Secretary of the United States Department of the

Interior.  Secretary Haaland is responsible for the administration, operations, and activities

of the Department.  In her official capacity, Secretary Haaland resides in Washington,

D.C.  Secretary Halland is being sued in her official capacity only.

9.    Defendant Bureau of Land Management is a Bureau within the Department of

Interior responsible for the oversight and administration of public lands.  BLM has its

headquarters in Washington, D.C.

10.    Defendant Tracy Stone Manning is the Director of the Bureau of Land

Management, United States Department of the Interior.  Director Manning is responsible

for the administration, operation, and activities of the BLM.  In her official capacity,

Director Manning resides in Washington, D.C.  Director Manning is being sued in her official capacity only.

11.     Defendant Appraisal and Valuation Services Office ("AVSO") is an Office within the Department of Interior providing real property and mineral valuation and evaluation services for the Department.  The Office has its headquarters in Denver, Colorado.

12.     Defendant Tim Hansen is Director of the Appraisal and Valuation Services Office, United States Department of the Interior.  Director Hansen is responsible for the administration, operation, and activities of the AVSO.  In his official capacity, Director Hansen resides in Denver, Colorado.  Director Hansen is being sued in his official capacity only.

13.     Defendant Division of Minerals Evaluation ("DME") is a Division within the United States Department of the Interior, AVSO providing minerals evaluation and valuation services to federal agencies.  The Division has its headquarters in Denver, Colorado.

14.     Defendant Kathy Kilgore is Director of the Division of Minerals Evaluation. Director Kilgore is responsible for the administration, operation, and activities of DME. In her official capacity, Director Kilgore resides in Denver, Colorado.  Director Kilgore is being sued in her official capacity only.

15.     Defendant Andrew Archuleta is Wyoming State Director, Bureau of Land Management, United States Department of the Interior.  State Director Achuleta is responsible for administration, operation, and activities of the BLM in Wyoming.  In his

COMPLAINT

official capacity, State Director Achuleta resides in Wyoming.  State Director Archuleta is being sued in his official capacity only.

16.     Plaintiffs Wyoming Trust Company, Nancy Butcher, and Kurt Hall are Trustees of the Dean W. Hall Mineral Trust dated September 25, 1981; Plaintiff Wyoming Trust Company, Nancy Butcher, and Kurt Hall are Trustees of the Dean W. Hall Irrevocable Trust dated July 1, 1982; Wyoming Trust Company is Trustee of the Joy Lucille Hall and Dean W. Hall Trust Dated July 10, 1973 ("Hall Family Trusts").  The Hall Family Trusts own lands located along Wildcat Creek in Campbell County, Wyoming that are the subject of the Hall Ranch - Wildcat Alluvial Valley Floor Fee Coal Exchange Application pursuant to the Surface Mining Control and Reclamation Act ("SMCRA"), P. L. 95-87 (codified at 30 U.S.C.A. § 1201 et seq.) and Wyo. Stat. §§35-11-401 through 35-11-437.  *See also* Federal Land Policy and Management Act of 1976 § 206.  43 U.S.C.A. § 1716.  The Hall Family Trusts own all the fee coal on the 11,865-acre Hall Ranch.

17.     Plaintiff Hall-Atlas, LLC, ("Hall-Atlas") is the lessee and agent of the Hall Family Trusts authorized to seek an exchange of the coal owned by the Hall Family Trusts.  The Hall Family Trusts are members of Hall-Atlas, LLC.

## BACKGROUND

18.     This case is about government agencies who have failed their constituents.  It is about public servants who have violated the very laws and regulations they are supposed to follow. This is the story of the Plaintiffs that calls out for remedies that only our courts can provide.

### A.  *19th Century to 1977:  An Iconic American Story Unfolds in Campbell County*

COMPLAINT

19.     The Hall family is a homesteading and ranching family with deep roots in Campbell County, Wyoming.  The Hall Ranch was assembled from original homestead claims, the earliest believed to have dated from 1901 by O.W. Hall and his son Ernest Hall.

20.     Building a sod home as their original shelter and through grit, determination, and hard work, the Halls slowly built the ranch through the Depression and into the twenty-first century—more than 100 years later.  The story of the Hall family in Wyoming is a magnificently American story of sacrifice and success that is at the core of who we are and aspire to be as a nation.  *See, e.g.,* Campbell County's Historic Ranches: The Hall Ranch, Gillette News Record, Sept. 8, 2011.

21.     Eventually, the Hall Ranch, located in Northeastern Wyoming about 20 miles north of Gillette, grew to just under 12,000 acres—including the 1,643.4 acres of alluvial valley floor ("AVF") fee coal, containing over 138 million tons of coal.

22.     In the 1960s and 1970s, there was strong interest in the privately-owned fee coal underlying the Hall Ranch, as well as federal coal surrounding the Hall Ranch.  The Hall coal rights were originally leased in 1967 by an agent of Exxon Coal Resources.  In 1974, Consolidation Coal Company top-leased the entire Hall Ranch.

**B.     *1977-2010:  Legislative Change and Hall-Atlas' Exchange Application***

23.     In 1977, Congress enacted the SMCRA, which prohibited future coal mining within AVFs even if privately owned.  This being a taking as confirmed by several federal courts, SMCRA included a <u>mandatory requirement</u> of the federal government to exchange equal-value minable federal coal for non-minable AVF coal.

COMPLAINT

24.    After SMCRA, Exxon negotiated a coal lease amendment in preparation for a SMCRA-mandated exchange.  Exxon submitted an application to the Wyoming Department of Environmental Quality ("WDEQ") — the sole and exclusive decision-maker on this question under SMCRA — for a determination as to whether the Hall Ranch coal was AVF coal or not.

25.    In 1985, WDEQ determined that Hall Coal met the AVF definition.  On March 25, 1985, Lyle Randen, Administrator of WDEQ, confirmed this in a detailed letter to Terry Smotherton of the Carter Mining Company (Exxon Coal and Minerals).  Exxon, however, ceased further efforts for an exchange given the reality that attempts by other parties to effectuate AVF coal exchanges had been mired in significant delay and litigation.

26.    The Hall family, given limited financial resources and professional expertise, was unable to continue pursuing the exchange until the formation of Hall-Atlas.

27.    Hall-Atlas delivered and presented its application package to BLM in a joint meeting on May 27, 2010.  At the meeting, BLM representatives commended the application as thorough and complete, indicating that BLM was prepared to move forward with the exchange.  Unfortunately, events subsequent to this meeting went from bad to worse.

28.    A key BLM employee, Brenda Neuman, indicated to Hall-Atlas representatives that the exchange was too large and would unacceptably enrich the Hall Family.  Other BLM officials, including Larry Claypool and Steve Hageman, expressed negative sentiments toward the exchange.  A Hall family representative noted with concern that the BLM officials seemed distressed by the exchange proposal.  It goes without saying that

the role of officials of the executive branch is to implement the law equitably, and not to allow their personal beliefs and biases to prevent or delay such implementation.

### C.  2010-2014:  BLM Objects in Bad Faith to the Size of Alluvial Valley Floor

29.    Concurrently, BLM took the startling step of unilaterally rejecting the WDEQ decision from 1985—notwithstanding the unequivocal statutory authority SMCRA grants to the states.  BLM took the unsupported position that the WDEQ's determination of 1,634 acres of land being in the AVF was incorrect and that its area should somehow only consist of 940 acres.  Asserting such an unsubstantiated position is a textbook example of arbitrary and capricious behavior by an administrative agency.

30.    During 2010 and 2011, Hall-Atlas representatives, as well as WDEQ itself, engaged in dozens of communications via email, telephone, and in-person meetings indicating the error of BLM's position.  BLM, however, categorically refused to change its position.  During this time period, BLM officials noted that they had not done a similar exchange in two decades, though this statement was factually incorrect.  For instance, the Gold Mine Draw Alluvial Valley Floor Exchange was completed in 2006.  *See, e.g.,* United States Department of the Interior Bureau of Land Management, Gold Mine Draw Alluvial Floor Exchange W-3397 & W-83394, Agreement to Negotiate a Coal Lease Exchange (June 13, 2005).

31.    In a January 26, 2011 phone call with Larry Messinger, a Senior Project Manager at Norwest Corporation and consultant to Hall-Atlas, Ms. Neuman suggested that the exchange was too large and that BLM could not exchange something that valuable – regardless of the law. This arbitrary and unsupported decision reducing the size of the AVF was the first of many based on personal bias and/or a desire to prevent the Plaintiffs

from profiting in any substantial way from an exchange. These two factors have no place in executing an exchange under the SMCRA.

32.     In telephone conversations with Mr. Messinger on February 9 and February 27, 2011, Carol Bilbrough from the WDEQ expressed frustration at BLM's repeated efforts to revisit the AVF determination. This decision is entirely within the State of Wyoming's authority, not BLM's, as the federal district court later confirmed (see *infra*).  Ms. Bilbrough also noted that Ms. Neuman from BLM expressed to her *the opinion that the exchange needed to be stopped because it would make too many people wealthy*. Such a statement is nothing short of shocking, not to mention part of a pattern of bad faith actions by BLM to prevent, withhold, and delay an exchange mandated by SMCRA.

33.     On July 1, 2011, Michael Sullivan, an attorney representing Hall-Atlas, wrote to Don Simpson, State Director of the Wyoming BLM.  On August 9, 2011, Mr. Sullivan also wrote to Larry Claypool and Brenda Neuman of BLM.  These letters explained why BLM's position with regard to the reduced acreage in the AVF was plainly incorrect, questioning the good faith of BLM.  Not surprisingly, BLM effectively ignored these communications. Over many years, BLM regularly ignored and failed to respond to many communications and detailed analyses from Hall-Atlas and its representatives.

34.     On September 1, 2011, Nancy Nutbrock of WDEQ wrote to Don Simpson and Larry Claypool of BLM to "reaffirm" WDEQ's determination of the size of the Wildcat Alluvial Floor.  For unknown reasons, however, this was insufficient for BLM.

35.     On September 7, 2011, Mr. Messinger of Norwest sent a letter to Robin Bailey, State Director in the Office of Senator Michael Enzi, with a detailed chronology of Hall-Atlas' interactions with BLM.  On September 12, 2011, Senator Michael Enzi noted in a

letter to Mr. Messenger that he had contacted BLM State Director Don Simpson to help address this issue.  On September 16, 2011, Director Simpson wrote to Nancy Nuttbrock of WDEQ outlining BLM's position.

36.     On September 19, 2011, Lyle Randen, the WDEQ official who had certified the Wildcat Alluvial Floor in 1985, signed a notarized affidavit confirming the work he did in 1985.  The fact that this subsequent confirmation was again insufficient for BLM suggests a very high level of bad faith against Hall-Atlas that continues until the present day, and that has stymied an exchange unquestionably mandated by law.

37.     Given BLM's unwillingness to change its position, Hall-Atlas was then obligated to appeal to the Interior Board of Land Appeals ("IBLA"), who accepted BLM's position without presentation or oral argument.  Subsequently, Hall-Atlas was again left with no choice but to bring a lawsuit in the United States District Court for the District of Wyoming.  The parties appeared before the Honorable Federal Magistrate Judge Kelly Rankin.  Eventually, BLM accepted Hall-Atlas and WDEQ's position on the size of the Wildcat AVF;l unfortunately, though, it took a time-consuming, expensive, and entirely unnecessary lawsuit in federal court.

38.     It was not until a May 22, 2014 letter from Donald Simpson, BLM State Director of BLM, that BLM accepted Wyoming's certification, and only after subjecting Hall-Atlas to years of unnecessary delay and expense in having to litigate an obvious proposition.  The letter was four years after the date of the filing of the application.

**D.  2014-2017:  BLM and DME Violate their Own Regulations to Reject the South Tract**

COMPLAINT

39.    Effective July 1, 2014, Hall-Atlas entered into an agreement with BTU Western Resources, a wholly-owned subsidiary of Peabody Coal Company, to lease AVF Exchange Coal.

40.    Hall-Atlas then promptly began the process of evaluating and nominating candidate Federal tracts for exchange as required by the exchange process, but also submitted a Conceptual Mine Plan ("CMP") — an extensive set of documents that outlines a plan to mine the coal.  Hall-Atlas wrote to BLM State Director Simpson on July 11, 2014 and nominated lands.  Simpson responded on July 31, 2014 stating that a meeting was to be held on August 21, 2014 and noting that the exchange process should be a collaborative one.

41.    On August 21, 2014, representatives of Hall-Atlas and Peabody met with BLM staff in Casper, Wyoming.  They discussed possible tracts, and at least one representative of BLM, Steve Wright, expressed concern with having DOI's Office of Valuation Services' Division of Minerals Evaluation conduct the valuation.  There was also discussion of dividing costs associated with the exchange.  Importantly, BLM noted that the South Tract[1] was deemed suitable to evaluate in detail for an exchange.

42.    In October 2014, BLM prepared the "Hall Ranch/Wildcat Creek Alluvial Valley Floor Fee Coal Exchange – 43 CFR3436 Tract Summary Report."  In the Report, BLM rejects the South Tract and Middle Tract,[2] but concludes that "*the tract that the BLM*

---

[1] The characteristics of the South Tract are as follows:  T. 41 N., R. 71W., Section 2: lots 5-7, 10-15, 18, 19, 20; Section 11:  lots 1-12, 14-6.

[2] The Middle Tract is not as well characterized in the document, but seems to be characterized as:  T47N, R72W, parts of SEc. 1 & 12; T47N, R71W, parts of Sec 7.

*would recommend to carry forward in the exchange process is the North Pod Tract.*[3] (emphasis added). Representatives of Hall-Atlas and BLM met subsequently in Casper, Wyoming, to plan next steps following this report.

43. A November 13, 2014 Memorandum from BLM's High Plains District Office to the Buffalo Field Office specifically states that BLM would consider both the South Tract and the North Tract for further evaluation.

44. On December 4, 2014, representatives of Hall-Atlas met with representatives of the BLM to discuss the Wildcat Creek AVF Exchange. Amber Haverlock, Realty Specialist at Buffalo BLM, was quite pessimistic about the timing of an exchange. Janelle Wrigley, Realty Officer in BLM Wyoming State Office, also stated that final appraisals must be completed before a Feasibility Report could be prepared, but this does not seem to represent a regulatory requirement. BLM representatives also discussed the division of costs, as in the October 2014 meeting.

45. On December 11, 2014, Curt Belden, a consultant to Hall-Atlas, had two separate conversations with Brenda Neuman and Steve Wright of BLM. On December 15, 2014, Mr. Belden had an additional conversation with Al Elser of BLM to find common ground and develop solutions for an exchange. Mr. Elser said he was transferring to Washington, D.C., and would remain in contact on the project. Unfortunately, these conversations did not resolve any issues, nor did Mr. Elser remain in contact.

---

[3] The characteristics of the North Pod Tract are as follows: T 52 N, R 72 West, 6th PM (Section 7, Lots 5-17; Section 18, Lots 8, 9, 16, and 17; Section 19, Lots 8, 9, and 16) and T 52N R 73 West, 6th PM (Section 13, Lots 9, 1-0, 15, 16; Section 24, Lots 1, 2, 7-10, 15-16). The Report states that "The north pod tract is located northwest and adjacent to the Hay Creek II LBA ["lease by application"] tract. The Buckskin mine is the surface owner of the potential tract."

COMPLAINT

46.    In contrast to other situations, such as the Nance-Brown AVF Exchange in Montana, BLM insisted on using the Office of Valuation Services' (OVS) Department of Minerals Evaluation (DME) to conduct a valuation of the Wildcat AVF Exchange.[4]  A third-party mutually agreeable to both Hall-Atlas and BLM should instead have been engaged.  An example is Stagg Natural Resources Consultants, which was used in the Nance-Brown AVF valuations.

47.    On January 21, 2015, Hall-Atlas' attorneys Kim Cannon and Mark Stewart wrote a detailed letter to BLM State Director Don Simpson "to get this exchange back on track for a timely completion," even offering a timetable to next steps.  Unfortunately, BLM failed to respond to the letter or act on the timetable.

48.    In a February 26, 2015 letter to Hall-Atlas' attorneys, BLM Acting State Director Mary Jo Rugwell stated that "the BLM believes the North Pod Tract is very similar to the coal located on the Hall Ranch property" and assured the attorneys that it is BLM's "intent to process this exchange in a timely manner that complies with the requirements established in statutes, regulations, and policies."  In retrospect, the assurance of "timely" resolution is insulting, not to mention that BLM subsequently removed even the North Pod Tract from consideration, as discussed *infra*.

49.    In March 2015, Mr. Belden emailed Steven Wright, Acting Assistant District Manager, Solids, at BLM with a number of questions regarding the Conceptual Mine Plan for the Wildcat Creek AVF.  Mr. Wright noted that the "economics (income) and appraisal will be solely conducted by OVS/OME [sic]", but provided no explanation as to why.  As

---

[4] The Office of Valuation Services was merged with the Office of Appraisal Services to create AVSO in 2018.  See Secretary of the Interior, Order No. 3363, Consolidation of the Office of Appraisal Services and the Office of Valuation Services into the Appraisal and Valuation Services Office (March 19, 2018).

documented herein, on multiple occasions BLM made conclusory statements regarding the valuation study with no explanation, or weak and unsupported explanations at best.

50.    On January 25, 2016, Duane Spencer, Field Manager of the BLM Buffalo Office, provided to Hall-Atlas DME's "Geological Evaluation and Mineral Commodity Valuation Report for the Hall Ranch Wildcat Creek Alluvial Valley Floor Fee Coal Exchange" which preliminarily suggested negative value for the underlying coal, implying that BLM would not be moving forward with an exchange.  On May 25, 2016, Hall-Atlas' attorney, Kim Cannon, wrote a detailed letter to Mr. Spencer highlighting numerous flaws with DME's report and BLM's approach to the exchange.  It is very disappointing that BLM and DME resorted to the spurious negative valuation argument, especially given the criticism this unsupportable tactic had already garnered in the federal courts.  *See, e.g.,* Whitney Benefits, Inc. & Peter Kiewit Sons' Co. v. Hodel, Order Ruling on Motion to Compel Compliance, Dt. Ct. WY (No. C84-193-K) (Dec. 3, 1985) ("If the effect of this Court's order requires the Secretary to make an exchange of federal coal which also has negative value when subjected to the same valuation method used on the Whitney property–then so be it.").

51.    On June 9, 2016, Mr. Spencer responded in a short letter, assuring "that the BLM is working toward completion of an exchange."  The letter did not even try to rebut the points made in Mr. Cannon's May 25, 2016 letter.  On July 1, 2016, Mr. Cannon responded to Mr. Spencer again noting the "incessant delays in moving forward with the Agreement to Initiate an Exchange under the mandatory language of SMCRA."  On July 14, 2016 Ryan Taylor of DME wrote to Pat Akers of Norwest with some questions,

without resolving any of the questions raised in Mr. Cannon's letter.  On August 8, 2016, Mr. Akers responded to Mr. Taylor with detailed responses to his questions.

52.    Hall-Atlas representatives subsequently attempted to maintain communications with officials at the BLM and DME.  It seems, however, that no one bothered to respond to their communications – other than superficial responses from Ryan Taylor, a Program Lead at OVS, and Amber Haverlock, Realty Specialist at BLM.  No progress was made on the valuation issues.  Representatives of Norwest, who had conducted the valuation, offered to meet with DME officials, but again these offers went unacknowledged.  During this timeframe, an attorney for Hall-Atlas even contacted Jason Hill, an attorney at the Department of Justice who was involved in the litigation surrounding the area of the alluvial floor (*supra*), for assistance in moving the matter forward.  Hall-Atlas was met with silence.

53.    In an October 4, 2016 letter, BLM formally rejected Hall-Atlas' CMP valuations.  The DME found, remarkably, that the Hall Ranch AVF Coal has a value of $0.  This letter enclosed a valuation memorandum, from Ryan Taylor at DME to Amber Haverlock at BLM, which came to an entirely unconvincing and contrived conclusion that the "final net present value of the income earning potential for hypothetically developing the coal resource in the Hall Atlas AVF area is calculated to be $-118,325,720, significantly less than zero."  As such, in DME's opinion, 138 million tons of coal that had been under lease to Exxon prior to the passage of SMCRA in 1977 was worth even less than zero.  This brings creative, scientifically flawed valuation to new heights.  Hall-Atlas alleges that the valuation was not based on sound principles of corporate finance.  Rather, it was a tainted, results-oriented process using unsupportable assumptions for coal price,

cost of capital, treatment of royalties, taxes, and the like.  Put simply, DME's valuations are works of fiction.

54.     BLM and DME ignored and violated the regulations related to exchanges.  For instance, 43 C.F.R. § 2201.3-2 notes that "[i]n estimating market value, the appraiser shall: (1) Determine the highest and best use of the property to be appraised; (2) Estimate the value of the lands and interests as if in private ownership and available for sale in the open market. . . ."  § 2201.3.-3 states that "[a]ppraisals prepared for exchange purposes shall contain, at a minimum, the following information. . . (f) a comparative market analysis and, if more than one method of valuation is used, an analysis and reconciliation of the methods used to support the appraiser's estimate of value; (g) A description of comparable sales, including a description of all relevant physical, legal, and economic factors. . . ."  Put simply, the DME valuations failed across all of these criteria.

55.     BLM's own Coal Evaluation Handbook was not followed.  For instance, The BLM Coal Evaluation Handbook, H-3073-1, Section 4.6.6 states that the discount rate "should be checked against actual economic conditions and for consistency with actual industry values prior to every analysis."  This was not done.  Section 3.7.3 of this Handbook notes that the "it is essential that the ET ("evaluation team") discuss likely contract prices and production costs with neighboring mine owners."  The Uniform Appraisal Standards for Federal Land Acquisitions, referenced in BLM's Land Exchange Handbook, H-2200-1, 1-18, mandate that "[i]n conducting DCF [discounted cash flow] analysis, the appraiser must avoid estimating a property-specific investment value to a particular owner instead of estimating the market value of the property if it were placed for sale on the open market."  Uniform Appraisal Standards for Federal Land

COMPLAINT

Acquisitions, 1.10.3. In addition, the Standards note that "[t]he appraiser's determination of highest and best use is one of the most important elements of the entire appraisal process." *Id*. at 1.4.3. *Cf*. National Parks & Conservation Ass'n v. Bureau of Land Mgmt, 606 F.3d 1058, 1066 (9th Cir. 2010). The standards also note the obvious importance of the "independence and objectivity of appraisers engaged in providing opinions of market value for just compensation purposes." *Id*. at 0.3. All of these mandates were violated, including, of course, BLM's use of DME, rather than an independent appraiser. Further, BLM asserted that the federal coal lands being proposed for exchange could not be exchanged because they had positive value. Without giving any reason, BLM refused to share the assumptions or modeling related to the federal lands.

56.    Moreover, BLM and DME failed to disclose the sources of data for their coal pricing. This is contrary to the procedures that govern the coal pricing process. The Land Exchange Handbook states:

> *Parties to the land exchange must adopt a full disclosure stance regarding relevant market information under their control that may be useful in establishing sound market value estimates for the properties.* This includes prior sales of the property, or known similar property, offers to buy or sell the property or known similar property. *Parties should avoid speculating on values. Speculation can generate unreasonable expectations and complicates reaching an agreement on value.* The intent of the full disclosure requirement is for existing agreements between non-Federal parties regarding conveyance of Federal and non-Federal lands to be considered as part of the appraisal. (emphasis added)

COMPLAINT

Land Exchange Handbook, H-2200-1, 7-1.  Yet, BLM and DME would not disclose the data

they used to set the coal pricing for their analysis. The Appraisal Services Division is

required to manage the appraisal process, and nothing in the Handbook says they must use

the DME for the valuations.

57.    Plaintiff also alleges that the requirements of BLM Instruction Memorandum

No., 2010-121, "Review of Land Exchange Proposals and Records Management" (May

14, 2010) were not fulfilled.  In addition, Plaintiff alleges not only that the BLM

Instruction Memorandum 2014-081, "Procuring Real Estate Valuation Services through

the Office of Valuation Services" (April 7, 2014), that BLM purported to apply, post-dates

Hall-Atlas' application–but that BLM does not even comply with the language in the

memorandum.  For instance, the memorandum states that "*[t]hese instructions do not*

*apply to mineral estate valuations for fluid and solid minerals and will not affect the*

*ability to use third parties that are able to assist the BLM with the acquisition of land or*

*interest in land in accordance with 602 DM 1.7 c.* [Part 602 of the Department of the

Interior Departmental Manual]." (Emphasis added).  Therefore, BLM should not have had

OVS perform the valuation and should have allowed Norwest to perform the valuation.

58.    With regard to costs incurred by Hall-Atlas, BLM has not followed the

instructions in its own Manual Transmittal Sheet, "3436 – Coal Lease and Coal Land

Exchanges – Alluvial Valley Floors" (Release 3-185, Nov. 2, 1987), which states clearly

in section .32 that "[q]ualified proponents of AVF fee title exchanges *do not have to pay*

*for the costs of processing their proposals or of acquiring resource data on the lands*

*being studied for exchange*." (emphasis added).  However, Hall-Atlas has been forced to

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

incur dramatic and continually increasing costs simply to vindicate the rights Congress guaranteed to landowners in the SMCRA.

59.     Plaintiffs do not know whether the lack of compliance with, and clear violations of, Regulations, Handbooks, Instruction Memoranda, Transmittal Sheets, and the like reflects a *de facto* national policy of the Department of the Interior – including DME and AVSO – not to abide by its own legal framework, or is limited to local officials in Wyoming.  They will seek to obtain this information via discovery.

60.     On November 16, 2016, Hall-Atlas' attorneys, Kim Cannon and Mark Stewart, sent a detailed letter to Duane Spencer of the BLM in response to BLM's letter of October 4, 2016 (*supra*).  They reiterated concerns that Hall-Atlas had raised on multiple occasions not only related to untenable valuations, but also importantly noting that BLM is violating the terms of State Director Donald Simpson's July 31, 2014 letter (*supra*) indicating that the nomination of tracts of land is a cooperative process, not one where BLM unilaterally makes decisions.  Hall-Atlas' attorneys also included detailed information from Norwest's valuation of the South Tract using DME's assumptions and yielding a "negative NPV of $136.7 million."  BLM's unilateral decisions demonstrate bad faith, arbitrary and capricious behavior, and violations of the legal and regulatory framework governing exchanges.

61.     On November 18, 2016, Wyoming Congresswoman Cynthia Lummis sent a letter to Duane Spencer of BLM asking him to keep her "posted on the developments of this exchange."  To Plaintiffs' knowledge, BLM did not respond to Representative Lummis.

COMPLAINT

20

62.     On November 22, 2016, Mr. Belden had a conversation with Amber Haverlock, BLM Realty Specialist, expressing Hall-Atlas' significant concerns, including the newly identified and entirely unacceptable tract, and the fact that running a valuation on the South Tract using DME assumptions would yield a zero value as well.  As usual, BLM did not address Hall-Atlas' concerns.

63.     Hall-Atlas then scheduled a meeting with BLM representatives, including State Director Rugwell, in Cheyenne on November 30, 2016.  During this meeting, it became clear that the valuation process was entirely unscientific.  The valuation might not even have been a "back of the envelope" calculation, since one BLM employee at the meeting simply asserted they "simply knew" the federal lands were worth more than $0.  At the conclusion of the meeting — and recognizing that a valuation of the federal lands South Tract had not been done — Mary Jo Rugwell, BLM Wyoming State Director, asked DME to prepare a valuation of the federal lands using "apples-to-apples" assumptions.

64.     On December 2, 2016, Hall-Atlas' attorney, Kim Cannon sent a follow-up letter to Ms. Rugwell highlighting the innumerable problems with DME's valuation.  As further follow-up, on January 17, 2017, Hall-Atlas sent a detailed letter to Robert Davidoff, Chief of the DME, reiterating numerous detailed concerns with DME's valuation.

65.     On February 13, 2017, DME Chief Katherine Kilgore sent a letter to Hall-Atlas responding to Hall-Atlas' January 17, 2017 letter and noting, rather astonishingly, that "[t]he purpose of the requirement to value exchange tracts in a 'similar manner'. . .does not mean that base assumptions, such as coal price, mine planning, or even valuation approach (income approach vs. comparable sales) must be the same on both sides of the

exchange." In doing so, Ms. Kilgore downplays *the regulatory requirement that non-Federal and Federal tracts need to be valued in the "same manner"* per 43 C.F.R. 2201.3-2(a)(5). Ms. Kilgore's letter is another example of BLM and DME's lack of regard for following applicable rules and regulations.

66.    During February, March and April 2017, Hall-Atlas representatives communicated several times with Ryan Taylor of the DME to clarify the timing and scope of the analysis, specifically whether the evaluation would be performed as a standalone, or as an extension of the analysis of North Antelope Rochelle Mine ("NARM") South Tract. On April 26, 2017, Hall-Atlas representatives held a conference call with Mr. Taylor. During this call, questions were raised about the timing and whether BLM had even shared certain critical data from Norwest Corporation with DME. It is important to note that DME accepted Norwest's geological model, but not its financial model. This raises further suspicions of wrongdoing.

67.    When, in May 2017, Hall-Atlas queried Mr. Taylor of DME about obtaining the results of the valuation, Mr. Taylor refused, noting that "BLM is technically our client." As such, Hall-Atlas was unable to receive the report unmediated by BLM. BLM's continued, unjustified insistence on having DME perform the valuation raises troubling questions about why and conflicts of interest because of the relationship between two groups. Hall-Atlas intends, through discovery, to obtain prior versions of the BME valuation, as well as communications between BLM and DME.

68.    On May 30, 2017, Hall-Atlas received a remarkable letter from Gregory Middleton, BLM Acting Field Manager. The letter stated, without offering any reasoning or justification, that "DME reviewed the Hall-Atlas mine model for the subject property

[NARM South Tract] and determined the best course was to construct a separate mine model for the subject property." Mr. Middleton then went on to state, without analysis, that the value of the South Tract ranged from $20,013,022 to $23,679,626, and that given the valuation of the Wildcat AVF was $0 (*supra*), "BLM will not offer the NARM South Tract for exchange."

69.     Putting a valuation of $0 on the Hall Ranch AVF Coal is the equivalent of not offering or executing an exchange. It makes no sense to say that an exchange at $0 valuation is an exchange. This $0 valuation strongly is one more indication of BLM's failure to comply with SMCRA's exchange requirement.

70.     Also on May 30, 2017, Hall-Atlas received the DME report that Director Rugwell had asked for. Contrary to what had been promised and required by the regulations, the valuation was not "apples-to-apples" as certain critical assumptions, estimates, and methodologies were different from what DME had asserted in its valuation of the Hall Ranch AVF Coal. This was an initial indication that BLM would be rejecting an exchange for the South Tract. Hall-Atlas' internal valuation of the South Tract differs markedly from DME's valuation.

71.     On June 15, 2017, Hall-Atlas representatives spoke again with Mr. Taylor to express their concerns. Hall-Atlas' attorneys, Kim Cannon and Mark Stewart, discussed the numerous and shocking inconsistencies in the DME's valuation in a July 12, 2017 letter to Mary Jo Rugwell and Gregory Middleton of, *inter alia*, the pricing methodology, cost of capital, and the like in the DME valuation. The letter included a copy of a July 4, 2017 Memorandum, prepared by Norwest Corporation, pointing to a number of egregious

problems related to DME's valuation of the NARM South Exchange Tract, including basic inaccuracies about the mining plan and the financial analysis.

72.    On July 18, 2017, Mr. Middleton responded to Mr. Cannon with an unhelpful response that stated, somewhat cryptically, that "[i]n light of the situation dictates related to this matter. . .we will be responding to you more fully in the near future."

73.    An August 14, 2017 Memorandum from Ryan Taylor to Duane Spencer attempted to refute the arguments made in the July 12, 2017 letter authored by Mssrs. Cannon and Stewart.  The memo, which somehow assumes that 138 million tons of coal are worth $0, is entirely unconvincing.  For instance, it offers no logical argument as to why the Wildcat AVF and South Tract need to be valued under differing methodologies. In fact, it confirms that the valuations of the Wildcat AVF and South Tract were not "apples-to-apples."  The Memorandum concludes that DME "was not directed by any BLM personnel, in any way, for mine plan assumptions, costs, methodology, or to arrive at a valuation conclusion."  Plaintiffs doubt this assertion and will seek appropriate disclosures during discovery.  DME's analysis also suffers from a fatal flaw:  in emphasizing distance from existing mining operations and doing the analysis of a "stand-alone" mine, it ignores entirely that a mine would have been operating on the Wildcat AVF were it not for SMCRA.  It is important to remember that prior to the passage of SMCRA the reserves in the Wildcat AVF were under lease to major coal operators. It is worth noting, for example, that the WDEQ certification of the alluvial valley floor was provided to Exxon as discussed *supra*.

**D.  2017-2021:  BLM Takes North Tract off the Table; Hall-Atlas Goes to Washington**

COMPLAINT

74.    As expected based on the preceding interactions, on August 17, 2017 Lonny Bagley of BLM rejected the South Tract and proposed three tracts none of which are even remotely acceptable to Hall-Atlas.[5]  The letter asserts that "OVS is the final arbiter of the valuation necessary to assess an equal value exchange."  The letter offers no support for this statement because there is none in the statutory and regulatory framework.  In addition, Mr. Bagley's letter repeats the fatal flaw in the DME analysis, stating that the "Wildcat AVF coal resource is unlikely to be minable in the near or even distant future, given the lack of proximity to an existing mine. . .."  This emphasis on distance to an existing mine ignores that the only reason there is no mine nearby is because of SMCRA.  Further, the distance to an existing mine here is much less than in the Nance-Brown case where the plaintiff obtained an exchange the distance to an existing mine.  Also remarkably, among the three tracts proposed, BLM did not list the North Tract which they themselves had proposed in their October 2014 report (see *supra*).  As such, the August 17, 2017 determination is doubly insidious:  not only does it reject the South Tract, but it also removes the North Tract from consideration.

75.    On October 20, 2017, Senator Michael Enzi sent a letter to the Secretary of the Interior in which the Senator "ask[s] for your full and fair consideration of my constituents' concerns, which are detailed in an attachment for your review."

76.    On December 19, 2017 Senator John Barrasso sent a letter to Brian Steed and Mary Jo Rugwell of BLM specifically requesting that "BLM perform a new evaluation of the tract to ensure that my constituent receives an equitable exchange of land consistent

---

[5] The three tracts proposed are:  "Portions of T.53N., R. 73W., Section 23 through 27. . . .Portions of T. 53 N., 73W., Sections 34 and 35. . . .Portions of T. 52N, R. 72 W, Section 1, and portions of T 52 N., R 73 W., Sections 1, 2, and 11. . . ."

COMPLAINT

25

with SMCRA." Senator Barrasso included a copy of BLM's May 30, 2017 letter (*supra*).

The recipients at BLM effectively ignored this request.

77.    Hall-Atlas continued to engage in its multi-year good faith effort to work with

BLM.  The pattern, however, is consistent:  initial contact, followed by radio silence.  A

few more examples illustrate this.

78.    During the summer of 2018, Hall-Atlas representatives worked diligently to try

to meet with legislators and regulators in Washington, DC.  On July 18, they met with

Congresswoman Liz Cheney and on July 19 with Senators John Barrasso and Mike Enzi.

In addition, Hall-Atlas representatives met with BLM Deputy Director Brian Steed on July

20, 2018.  Mr. Steed was effectively Acting Director of BLM given the BLM Director

position was vacant at that time.

79.    On July 24, 2018, Hall-Atlas attorney Kim Cannon sent a follow-up letter to

Mr. Steed emphasizing the successful litigation that Hall-Atlas pursued in the context of

the delineation of the area of the alluvial floor (*supra*).  As a follow-up, on October 27,

2018 Hall-Atlas also sent a detailed letter to Mr. Steed, including numerous supporting

documents, which clearly articulated the decades-long frustrations with the Department of

the Interior, pointing to "numerous evasions of due process and misuses of information."

80.    During October and November 2018, Hall-Atlas representatives communicated

with BLM officials – including Amanda Kaster-Averill, Advisor, and Kathleen Benedetto,

Senior Advisor, at BLM in Washington DC – to set up another meeting with Mr. Steed.

81.    On November 1, 2018, representatives of Hall-Atlas met with Mr. Steed.

Following the November 1, 2018 meeting, there were several email communications, as

well as at least one telephone call, between Mr. Belden and Ms. Benedetto.  Topics

COMPLAINT

included, *inter alia*, the Nance-Brown exchange as an example, as well as a list of coal

exchanges handled by BLM since approximately 1980.  Mr. Belden provided detailed

information on the myriad difficulties Hall-Atlas had faced, as well as about the Nance-

Brown exchange.  *See, e.g.,* United States Department of the Interior Bureau of Land

Management, Nance-Brown AVF Coal Exchange Rosebud County, Montana, MTM

99236 (August 25, 2011).  Ms. Benedetto seemed to acknowledge that Hall-Atlas was

not treated fairly in the exchange and valuation process.

82.     On November 14, 2018, Ms. Benedetto told Mr. Belden that Michael Need,

BLM Associate Director for Land and Minerals, was reviewing the materials.  On

November 30, 2018, Mr. Belden sent an email to Mr. Need, noting that Ms. Benedetto had

mentioned Mr. Need was reviewing the Wildcat AVF Exchange.  Mr. Belden did not

receive a reply to his message.  On December 17, Jack Rand of Hall-Atlas sent a follow-

up message to Ms. Benedetto, but received no response.

83.     In late 2018 and early 2019, an attorney representing Hall-Atlas contacted

Jason Hill, now Senior Counselor at BLM, who was familiar with the Hall-Atlas situation

and was even a government attorney in the litigation Hall-Atlas was obligated to

undertake to establish the area of its alluvial floor (discussed *supra*).  Mr. Hill, however,

did not respond to subsequent communications.

84.     On December 27, 2018, representatives of Hall-Atlas met with staff of

Wyoming Senator Mike Enzi in Gillette, WY.

85.     In January and February 2019, Mr. Belden contacted Ms. Benedetto, asking

for an update and eventually noting that Hall-Atlas was considering returning to

COMPLAINT

27

litigation.  There was no follow-up to these communications, other than Ms. Benedetto saying she did not have an update.

86.     On June 10, 2019 the BLM Wyoming Freedom of Information Act  ("FOIA") Office sent a letter to Hall-Atlas to communicate an FOIA request by Wild Earth Guardians.  On June 20, 2019, Hall-Atlas provided, by email and certified mail, a letter to BLM Director Duane Spencer referencing the exchange in the context of this FOIA request–confirming Hall-Atlas' continuing interest and good faith in pursuing an exchange.  The same day, BLM acknowledged receipt, but did not follow up.

**D.   2021-2022:  BLM Strongly Discourages Potential Exchange Partners**

87.     Beginning in November 2021, Hall-Atlas identified interest in an exchange with the Navajo Transitional Energy Company (NTEC).  In January 2022, there were discussions between Hall-Atlas and the NTEC to exchange the West Antelope III LBA ("lease by application") Tract—North End Section 8 & 9.  On January 11, 2022 a meeting was held among several representatives of both NTEC and Hall-Atlas.

88.     Contrary to BLM's assertions that there was no response to their August 2017 denial, Lonny Bagley, BLM District Manager for the High Plains District had several communications with Mr. Belden early 2022, including an in-person meeting on January 26, 2022 and a telephone conversation on March 2, 2022.  Issues such as the possible exchange with NTEC were discussed at length.

89.     Subsequent to these communications, as indicated in communications on March 14, 2022 between NTEC and Hall-Atlas, BLM discouraged NTEC from pursuing the exchange with Hall-Atlas.  Importantly, NTEC representatives suggested that their

COMPLAINT

current LBA nomination would be jeopardized if they advocated for the exchange with Hall-Atlas.

90.    On March 2, 2022, Mr. Belden spoke with Lonny Bagley, Acting District Manager for High Plains, regarding the status of the Hall-Ranch AVF Exchange project proposal to nominate a tract of coal out of the West Antelope III LBA.  Mr. Bagley was quite discouraging at this meeting, reiterating that the Wildcat AVF was of zero value.

91.    On March 17, 2022, representatives of Hall-Atlas held a productive meeting with representatives of Kiewit to discuss an exchange.  On May 4, 2022, Kiewit declined interest, noting concern about restrictions BLM might place on their own operations.

92.    This discouragement was very similar to that expressed by NTEC.  Plaintiffs intend to obtain more information regarding the discussions between BLM and NTEC, as well as BLM and Kiewitt–and present the content of the discussions at trial.

93.    In a letter dated July 5, 2023, and in response to Hall-Atlas' 60-day notice prior to filing this lawsuit, Todd Yeagher of BLM stated that Hall-Atlas had not responded to BLM's August 17, 2017 letter.  The facts outlined above show amply that Mr. Yeagher's assertion is plainly incorrect.  BLM officials in Wyoming cannot credibly say that they knew nothing about Hall-Atlas' attempts to find exchange partners when these BLM officials communicated with the potential exchange partners.

94.    Defendants led Plaintiffs to believe for decades that they were going to receive a proper coal exchange as the law of the United States of America requires.  The Plaintiffs relied on the various federal governmental agencies' representations.

95.    As a result of the parties' attempts to culminate an exchange, Plaintiffs fully assert the tolling and/or equitable estoppel of any applicable statute of limitations.

**CONCLUSION**

96.     This case is about more than multiple violations of specific laws.  It is about the right of citizens to seek redress against the government.  It is about the bad faith behavior of public servants that is contrary to the laws they are supposed to follow.  It is about the role of the courts as a last resort to preserve democratic values where the political branches have failed.  As the Court in the Nance-Brown case noted, "*[t]he law does not require the doing of futile acts, and this Court will not fault Plaintiffs for trying for decades to negotiate an exchange before seeking judicial assistance.*"  Jay Nance et al. v. Sec'y of the Interior, Order Re Motions for Summary Judgment, CV-06-125-BLG-RFC (May 29, 2008) at 10. (emphasis added).

97.     Hall-Atlas continues to be stonewalled by the Department of the Interior, after spending hundreds of thousands of dollars on advisors (such as Norwest Corporation and multiple law firms and consultants), as well as travel to and from Wyoming and Washington D.C. This is not to mention thousands of hours of uncompensated time Hall-Atlas' members have had to devote to a simple and unassailable proposition:  obtaining what the law requires under SMCRA.

98.     Hall-Atlas' tragedy is an American tragedy that transcends political lines.  For instance, Republican Representative Rob Bishop introduced hearings on "Threats Intimidation and Bullying by Federal Land Management Agencies" by noting that "[t]oday we are going to hear about a number of troubling cases in which Federal land management agencies have employed abusive tactics to extort rural families into giving up

property rights, or to *bully farmers and ranchers into making concessions to which the federal agency has no legal right*." (emphasis added).  Democratic Arizona Representative Raul Grijalva subsequently observed that, "all Federal employees, regardless of rank and position, should uphold the highest standards of professionalism, and to provide the best possible service to the public.  And I think that we can all agree that the vast majority do so.  Unfortunately. . .*there will be instances where employees do not live up to that standard, and they must be held accountable*." (emphasis added).  "Threats, Intimidation and Bullying by Federal Land Management Agencies," Oversight Hearing before the Subcommittee on Public Lands and Environmental Regulation of the Committee on Natural Resources, U.S. House of Representatives, Serial No. 113-50 (Oct. 29, 2013).  *See also* House Committee on Natural Resources, Press Release:  Federal Land Managers Intimidation, Bullying Threaten Citizens Rights, Create a Hostile Environment (July 24, 2014), *available at*

https://naturalresources.house.gov/news/documentsingle.aspx?DocumentID=389119.

99.    The Plaintiffs are hard-working property owners who have been deprived of the value of their land, due to multiple and systemic violations of the law and bad faith behavior by the Department of the Interior, BLM, and AVSO.  Put simply, the ordeal they have been forced to suffer for decades is antithetical to the values America stands for and cannot be tolerated in our constitutional democracy.


FIRST CAUSE OF ACTION

Violations of APA and Other Regulations

(Against all Defendants)

COMPLAINT

100.   Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 99.

101.   DME should not have conducted the valuation study of the Hall Ranch AVF, because of the conflicts of interest with BLM and flawed methods described herein.

102.   Further, BLM should not have accepted DME's inaccurate and flawed valuation study, which put the exchange value of Hall Ranch AVF at $0. Instead, BLM should have accepted the Norwest mine plan and its valuation of $1.3 billion of lost economic opportunity from not being allowed to engage in mining activity at Hall Ranch AVF for the time period 1977 to 2012 (for instance, under the agreement with Exxon), and of $333 million from 2012 to 2038 (for instance, under the Peabody lease).

103.   Accordingly, DME's conclusion that the exchange value of the Hall Ranch AVF is $0, which BLM accepts, as described herein, is irretrievably flawed with faulty analysis, marked by conflicts of interest which eviscerate its credibility and conclusions, contrary to the procedures of the Coal Evaluation Handbook and the Land Evaluation Handbook and other regulations, arbitrary and capricious, and not in compliance with the law as required by the Administrative Procedures Act, 5 U.S.C. § 706(2).

104.   Independent of the valuation issues, BLM unlawfully and unreasonably withheld the exchange with Hall-Atlas in violation of the Administrative Procedures Act, 5 U.S.C. § 706(1).

<u>SECOND CAUSE OF ACTION</u>

Compel a Coal Exchange Under SMCRA

(Against all Defendants)

COMPLAINT

32

105.   Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 99.

106.   The Plaintiffs are entitled to a mandatory exchange of coal tracts pursuant to the statutory conditions set forth in 30 U.S.C. § 1260(b)(5) of SMCRA, and to interest of the value of the monies they have been deprived of.

107.   The Secretary of the Department of the Interior is charged with the responsibility of carrying out a coal exchange program to acquire private fee coal precluded from being mined by the restrictions of SMCRA in exchange for Federal coal which is not so precluded.

108.   BLM officials and the Secretary of the Department of the Interior have led the Plaintiffs to believe that they are entitled to an exchange. Moreover, the Plaintiffs were also led to believe that BLM officials and the Secretary of the Department of the Interior were honoring the law, when, in reality, the federal government has failed to fulfill its obligations under SCMRA to the Plaintiffs.

109.   The Plaintiffs are therefore entitled to an exchange -- along with a Court ordered schedule for completion -- equal to their entire fee coal interest valued at the date of SMCRA's passage in 1977, plus all increases in value due to the passage of time, as well as interest on all monies to which the Plaintiffs have been deprived.

110.   If necessary, the Plaintiffs are also entitled to a money payment for equalization of the value of the federal coal exchanged for the value of the Plaintiffs' coal.

THIRD CAUSE OF ACTION

Declaratory Judgment

(Against all Defendants)

COMPLAINT

33

111.   Plaintiffs reallege and incorporate herein by reference the allegations contained in paragraphs 1 through 99.

112.   The Plaintiffs claim the following declaratory relief:

a.   That DME's exchange value of $0 of the Hall Ranch AVF Coal is null and void and shall not be used in any coal exchange or monetary compensation calculations.

b.   That BLM shall accept the valuation analysis and calculations of Norwest as to the Hall Ranch AVF Coal.

c.   That DOI and BLM have violated the letter and spirit of the SCMRA, Administrative Procedures Act, the Coal Evaluation Handbook, and the Land Evaluation Handbook.

WHEREFORE, the Plaintiffs pray judgment against the Defendants, and each of them, as follows:

1.   For an exchange of coal as provided by federal law, including all costs and fees as allowed by law, under a Court ordered schedule using the Norwest valuation study;

2.   For a money judgment, in an amount to be proven at trial estimated to exceed $1.6 billion;

3.   For a declaration that DME's exchange value of $0 of the Hall Ranch AVF Coal is null and void and shall not be used in any coal exchange or monetary compensation calculations;

4.   For a declaration that BLM shall accept the valuation analysis and calculations of Norwest as to the Hall Ranch AVF Coal;

COMPLAINT

34

5.      For a declaration that DOI and BLM have violated the letter and spirit of the
SCMRA, Administrative Procedures Act, the Coal Evaluation Handbook, and the Land
Evaluation Handbook;

6.      For attorney's fees;

7.      For all other allowable costs and fees, including but not limited to costs and
fees paid by the Plaintiffs to date in their attempt to obtain a coal exchange; and

8.      For such other equitable relief as the Court deems just and proper.


Dated this 16th day of August, 2023.


S. Gregory Thomas, WY Bar No. 5-2653
Thomas & Thomas LLC
316 S. Gillette Ave., Suite 200
Gillette, WY 82716
(307) 257-5298
greg@tntlaw.org


Douglas Park *
CA Bar No. 233398
Reza Dibadj *
CA Bar No. 240829
Park & Dibadj, LLP
655 Oak Grove Ave., Unit 329
Menlo Park, CA 94026
(650) 814-3933
doug@parkdibadj.com
reza@parkdibadj.com

* Pending Admission *Pro Hac Vice*

COMPLAINT

35